**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | **CRIMINAL ACTION** |
| | ) | **NO. 09-806** |
| | ) | |
| DWAYNE PARKER, | ) | |
| | ) | |
| Defendant. | ) | |

_____

**MOTION TO SUPPRESS EVIDENCE**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

RUFE, J.                                                                                          **November 5, 2010**

The United States charges Defendant Dwayne Parker ("Defendant") with one count of

possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).  Defendant has

filed a Motion to Suppress Physical Evidence and Statements [Doc. No. 18], seeking the

suppression of physical evidence obtained on October 22, 2009 in connection with an

investigative stop of a silver Cadillac Escalade, and a subsequent incriminating statement made

by the Defendant on January 11, 2010.

Upon consideration of Defendant's Motion to Suppress Physical Evidence and

Statements, the Government's Response thereto [Doc. No. 25], testimony presented at an

evidentiary hearing and oral argument thereon, and upon further review of the hearing transcript

[Doc. No. 39], the Court now enters its findings of fact and conclusions of law.

**FINDINGS OF FACT**

1.      On October 22, 2009, at or between approximately 3:54 a.m. and 4:15 a.m., Philadelphia police officers working the 12 a.m. to 8 a.m. shift in the 25th District received two radio calls from police dispatch with flash (descriptive) information regarding a robbery in progress and a person with a gun.[1]

2.      The flash information provided the location of the activity as 300 West Glenwood Avenue, and the suspected vehicle as a silver-colored Cadillac occupied by black males.[2] Officer testimony varies on whether the flash information further specified the Cadillac as an Escalade and/or SUV: Officer Binns recalls the flash information specifying the Cadillac as an Escalade; Officer Morace vaguely recalls the flash information specifying the Cadillac as an SUV; and Officers Lewis and Gorman do not recall the additional details.[3]

3.      The 300 West Glenwood Avenue area is regarded as a mid-level crime area.[4]

4.      All officers responding to the flash information were in marked patrol units, attired in full police uniform.[5]

5.      In response to the first radio call by dispatch, Officers Lewis, Binns, and Gorman mistakenly responded to 300 West Sedgley Avenue, instead of 300 West Glenwood Avenue. Upon realizing the mistake, the officers traveled to 300 West Glenwood

---

[1]   Transcript of suppression hearing held on September 9, 2010 ("Tr.") at 6:1-8, 7:11-17, 10:11-13, 10:24-25, 43:17 (testimony of Sergeant Gregory Morace); 61:19-24, 63:15-25, 64:13-22, 68:12-22, 112:9-24 (testimony of Officer Philip Lewis); 134:1-11, 134:20-135:7,136:18-137:3 (testimony of Officer Christopher Binns); 165:18-166:21 (testimony of Officer Kevin Gorman); 184:24-185:2 (testimony of Detective John Lichtner).

[2]   Id. at 11:2-21, 24:15-21 (testimony of Sergeant Morace); 65:24-66:5, 112:16-113:23 (testimony of Officer Lewis); 137:17-19, 154:15-23, 163:4-9 (testimony of Officer Binns); see also 166:22-167:19 (testimony of Officer Gorman).

[3]   Id. at 25:1-18 (testimony of Sergeant Morace); 113:21-23, 124:9-125:9 (testimony of Officer Lewis); 136:18-137:3 (testimony of Officer Binns); see also 167:4-6 (testimony of Officer Gorman).

[4]   Id. at 69:16-70:9 (testimony of Officer Lewis).

[5]   Id. at 12:7-14 (testimony of Sergeant Morace); 64:3-7 (testimony of Officer Lewis); 134:23-24 (testimony of Officer Binns); 166:6-9 (testimony of Officer Gorman).

Avenue.[6]

6.     The first and second radio calls were approximately one minute apart, and it took the officers no more than one minute to reach the 300 West Glenwood Avenue area.[7]

7.     Officers Lewis and Binns were the first responders.[8]  While the officers were traveling westbound on Glenwood Avenue, they observed a silver Cadillac Escalade, which they believed matched the flash information, make a left onto Glenwood Avenue from 3rd Street.  Officers Lewis and Binns were behind the Cadillac.  Both vehicles were traveling westbound on Glenwood Avenue.[9]

8.     All of the Cadillac's windows behind the front doors were tinted.[10]  Officers Lewis and Binns could not see exactly how many individuals occupied the vehicle as they were driving behind it.[11]

9.     Without any provocation by the officers, the driver of the Cadillac pulled over to the right side of the road and stopped in front of a closed automobile lot.[12]  Based on previous experiences, Officer Lewis believed that when the Cadillac pulled over, it was possibly an avoidance tactic.[13]

10.    The officers pulled their marked police vehicle behind the Cadillac and then activated their overhead lights.  The two officers then approached the Cadillac by foot on either

---

[6]  Id. at 66:1-67:10, 100:10-101:4 (testimony of Officer Lewis); 135:25-136:17, 153:23-25 (testimony of Officer Binns); 167:10-168:20 (testimony of Officer Gorman).

[7]  Id. at 11:6-24 (testimony of Sergeant Morace); 64:16-22, 67:2-10 (testimony of Officer Lewis); see also id. at 135:12-136:1 (testimony of Officer Binns); 168:21-24 (testimony of Officer Gorman).

[8]  Id. at 126:16-127:1 (testimony of Officer Lewis).

[9]  Id. at 70:10-71:8, 71:24-72:7, 92:8-93:5 (testimony of Officer Lewis); 137:11-139:11 (testimony of Officer Binns); see also id. at 12:1-4, 19:18-20:3 (testimony of Sergeant Morace).

[10]  Id. at 20:4-8, 50:7-23, 57:25-58:21 (testimony of Sergeant Morace); see also id. at 142:11-12 (testimony of Officer Binns).

[11]  Id. at 127:5-20 (testimony of Officer Lewis); 142:3-7 (testimony of Officer Binns).

[12]  Id. at 71:3-22 (testimony of Officer Lewis); 139:8-140:6 (testimony of Officer Binns).

[13]  Id. at 128:17-131:3 (testimony of Officer Lewis).

side of the car with their weapons drawn.[14]  At the point of approach, the officers observed five black males inside the Cadillac.[15]

11.     The five males were later identified as follows: Khalil Smith was the driver of the Cadillac; Ryan Gary was seated in the front passenger seat; William Jefferson was seated immediately behind the driver in the second row of seats; Anthony McFarland was seated immediately behind the front passenger in the second row; and Defendant Dwayne Parker was the lone passenger seated in the third row on the driver's side.[16]

12.     Officers Lewis and Binns observed Defendant Dwayne Parker with both of his hands reaching downward, looking downward, and making sudden movements.[17]

13.     All of the occupants of the vehicle were ordered to put their hands in the air; they complied.[18]

14.     Additional units arrived on the scene, including Sergeant Morace, who parked his marked police vehicle in front of the Cadillac.[19]

15.     For purposes of officer safety, the radio call reporting a violent crime, the officers individually removed the five men from the Cadillac, frisking them for weapons and placing them on or near the sidewalk.  The individuals were subsequently detained in the back of the various police vehicles.[20]

---

[14]  Id. at 71:19-72:16, 116:6-17 (testimony of Officer Lewis); 139:21-25, 141:11-142:2, 156:2-24 (testimony of Officer Binns).

[15]  Id. at 127:5-20 (testimony of Officer Lewis); 142:3-15 (testimony of Officer Binns).

[16]  Id. at 74:5-9, 81:23-25 (testimony of Officer Lewis); 145:1-2, 148:18-19 (testimony of Officer Binns); 200:9-19 (testimony of Agent Bain, quoting FD302 form that memorialized Parker's interview); see also id. at 183:5-24 (testimony of Detective Lichtner).

[17]  Id. at 72:21-74:18 (testimony of Officer Lewis); 142:15-18 (testimony of Officer Binns).

[18]  Id. at 31:10-16 (testimony of Sergeant Morace); 73:13-18 (testimony of Officer Lewis); 142:24-143:7 (testimony of Officer Binns).

[19]  Id. at 11:25-13:10 (testimony of Sergeant Morace); 116:18-20 (testimony of Officer Lewis).

[20]  Id. at 13:8-14:2, 29:1-32:13, 52:4-23 (testimony of Sergeant Morace); 74:24-76:8, 81:16-19, 120:3-121:25 (testimony of Officer Lewis); 145:19-147:6 (testimony of Officer Binns).

16.     While the five men were outside of the Cadillac, Sergeant Morace looked inside the vehicle through the open door behind the driver's seat. Using his flashlight, he illuminated the inside and observed the handle of a firearm protruding from the top of an open duffle type bag on the floor in the second row.[21]

17.     William Jefferson, who had been seated immediately behind the driver in the second row, admitted to the ownership of the firearm.[22]

18.     Soon after Jefferson's admission, Officer Lewis also looked inside the vehicle with his flashlight through the same open door behind the driver's seat and observed a firearm on the floor in the third row where Defendant Dwayne Parker had been seated.[23]

19.     This weapon was later identified as a .32 caliber black Beretta hand gun, serial number 94214.[24]

20.     On scene, as the occupants of the Cadillac were outside of the vehicle, Sergeant Morace contacted the police dispatcher to request additional information about the 911 caller. The police dispatcher gave him a callback number for the complainant. Sergeant Morace asked the police dispatcher to attempt to contact the complainant. Sergeant Morace called the number as well. The calls attempted by the dispatcher and Sergeant Morace went straight to voicemail. Consequently, the calls regarding the robbery remained anonymous because the complainant could not be located and the calls were not substantiated.[25]

21.     William Jefferson and Dwayne Parker were arrested for weapons offenses. The other three men were transported to the Philadelphia Police Department to be interviewed by a

---

[21]   Id. at 14:3-18, 33:19-34:2 (testimony of Sergeant Morace); 78:7-11, 79:13-21 (testimony of Officer Lewis); 147:7-13 (testimony of Officer Binns).

[22]   Id. at 14:12-15:11 (testimony of Sergeant Morace); 78:7-18, 105:21-23 (testimony of Officer Lewis); 147:11-148:19 (testimony of Officer Binns).

[23]   Id. at 17:10-14 (testimony of Sergeant Morace); 81:9-83:25, 122:16-123:3 (testimony of Officer Lewis); 149:14-150:2, 164:18-21 (testimony of Officer Binns).

[24]   Id. at 84:1-87:1 (testimony of Officer Lewis); 199:12-19 (testimony of Agent Bain).

[25]   Id. at 32:14-33:21 (testimony of Sergeant Morace); 89:25-90:15 (testimony of Officer Lewis); 150:20-151:4 (testimony of Officer Binns); 186:12-15 (testimony of Detective Lichtner).

detective. They were later released without being charged with any crimes.[26]

22. Based on the discovery of the two firearms, the Cadillac was impounded, towed to a secure police facility and held for a search warrant, which was obtained by Detective John Lichtner.[27]

23. During execution of the search warrant, Detective Lichtner seized $338 from the rear of the Cadillac.[28]

24. There was virtually no pedestrian or motor vehicle traffic in the area of 3rd and Sedgley and 3rd and Glenwood during the relevant early morning hours. Upon completion of the on-scene investigation, Sergeant Morace saw one male two blocks away, standing on the corner. The Sergeant asked this person whether he was the 911 caller, and the person indicated he was not. The Sergeant also saw one other vehicle well into the investigatory stop, and he directed this vehicle to pass around as not to interfere with the investigation. No other silver Cadillacs or silver SUVs were observed in the area.[29]

25. On January 11, 2010, FBI Agent Donald Bain took federal custody of Defendant Dwayne Parker due to an active federal arrest warrant against him. Parker was transported to the William Green Federal Office Building, 600 Arch Street, 8th Floor, Philadelphia, Pennsylvania for routine processing. Shortly after processing, Parker was advised of his *Miranda* rights, both orally and in writing. Parker then waived his right to an attorney and his right to remain silent by signing an Advice of Rights Form, which encompassed the *Miranda* rights. Subsequent to signing the Form and waiving his rights, Parker voluntarily made an incriminating oral statement to Agent Bain, which was memorialized in an FBI FD302 Form by Agent Bain soon thereafter.[30]

---

[26] Id. at 53:7-13 (testimony of Sergeant Morace);150:13-19 (testimony of Officer Binns); 172:2-14, 181:13-184:3 (testimony of Detective Lichtner).

[27] Id. at 18:23-19:17 (testimony of Sergeant Morace); 90:16-91:11 (testimony of Officer Lewis); 151:17-152:11 (testimony of Officer Binns); 173:10-177:9 (testimony of Detective Lichtner).

[28] Id. at 178:12-13, 180:16-22 (testimony of Detective Lichtner).

[29] Id. at 26:7-17, 45:18-20, 47:6-14 (testimony of Sergeant Morace); 67:11-13, 69:2-6, 98:19-99:11 (testimony of Officer Lewis); 137:4-10, 140:7-141:10 (testimony of Officer Binns).

[30] Id. at 194:15-200:8, 202:14-22, 203:11-204:8 (testimony of Agent Bain).

**DISCUSSION**

Defendant Parker presents one argument in support of his motion to exclude the evidence obtained on October 22, 2009. He alleges that his Fourth Amendment rights were violated because there was no reasonable suspicion for the vehicle stop, and that all evidence seized, namely the firearm and the money, as well as the incriminating statement which directly resulted from the illegal seizure, are fruits of the poisonous tree and must be suppressed. This Court will examine only the validity of the initial stop, since Defendant Parker does not separately challenge the reasonableness or intrusiveness of the investigation following the stop. The burden is on the Government to prove by a preponderance of the evidence that any warrantless search or seizure that occurred was lawful.[31]

**A.    The responding officers had reasonable suspicion justifying the stop of the vehicle containing the defendant.**

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures."[32] Pursuant to that prohibition, the warrant requirement acts as protection against Fourth Amendment violations by law enforcement. At issue here is the "*Terry* stop" exception to the warrant requirement in which "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot."[33] The level of suspicion required by *Terry* is less than

---

[31]    See United States v. Morales, 861 F.2d 396, 399 (3d Cir. 1988).

[32]    U.S. Const. amend. IV.

[33]    Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)).

the probable cause standard and need not be supported by a preponderance of evidence,[34] but the officer must have a " 'particularized and objective basis' for suspecting legal wrongdoing"[35] and it must be more than a mere "hunch."[36]  Law enforcement expertise and training can be a factor in the analysis.[37]  A court evaluates the objective basis for a stop in light of the totality of the circumstances surrounding it,[38] hence, the reasonable suspicion inquiry is highly fact-dependent in nature.[39]

Since the initial stop constitutes the alleged constitutional violation here, the relevant facts known to the police officers preceding the stop acquire particular salience.  The Court thus begins its *Terry* analysis by evaluating the information provided by the anonymous 911 caller, relayed by the police dispatcher to the officers on patrol, that led to the stop.

At or between approximately 3:54 a.m. and 4:15 a.m., police dispatch communicated two calls to the 25th District Philadelphia police officers regarding a robbery in progress and a person with a gun.  The reported location of that activity was 300 West Glenwood Avenue, and the suspected vehicle was reported to be a silver-colored Cadillac—possibly an Escalade or SUV—occupied by African-American males.

---

[34]  Id.

[35]  United States v. Arvizu, 534 U.S. 266, 273 (2002) (referencing United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

[36]  Terry v. Ohio, 392 U.S. 1, 27 (1968).

[37]  Arvizu, 534 U.S. at 273.

[38]  United States v. Nelson, 284 F.3d 472, 477-78 (3d Cir. 2002); Sharrar v. Felsing, 128 F.3d 810, 818 (3d Cir. 1997).

[39]  United States v. Goodrich, 450 F.3d 552, 553 (3d Cir. 2006).

Regarding the nature of the report to which the officers responded, the Court focuses on the content of the report to determine whether it "provide[d] a particularized and objective basis for suspecting (1) the particular [person or] persons stopped (2) of criminal activity."[40] The radio call described the suspected vehicle as a silver Cadillac, as described above. No further information was provided about the Cadillac. Although officer testimony is unclear regarding the specific number of occupants in the vehicle provided by the flash information, the officers agree that the occupants were reported to be male and African-American. However, Officers Lewis and Binns could not clearly see within the vehicle as it was en route, presumably since the back windows were tinted and the officers were behind the Cadillac, and the Court accepts their credible evidence that they used the vehicle description (not the specific number of occupants or their race) to identify and seize the vehicle in this case.

Defendant challenges the information contained in the flash as lacking the requisite degree of specificity to justify the vehicle stop. This Court agrees with Defendant that the tip may have been unreliable and was insufficiently specific. First, since the tip resulted from an anonymous 911 call, the officers did not have an opportunity to assess reliability, credibility and demeanor.[41] In fact, Sergeant Morace and the police dispatcher attempted to contact the complainant with the callback number to no avail. Second, the content of the tip was lacking in detail. It simply stated that there was a robbery in progress at 300 West Glenwood Avenue, and the suspected vehicle was a silver Cadillac Escalade/SUV, occupied by black males. Because there could be numerous individuals and vehicles fitting this generalized description in the 300

---

[40] Id. at 560 (citing Florida v. J.L., 529 U.S. 266, 272 (2000)).

[41] See United States v. Valentine, 232 F.3d 350, 354 (3d Cir. 2002).

West Glenwood Avenue area, the tip lacked the detail required to give rise to reasonable suspicion.[42]

Since the anonymous call, by itself, is insufficient to establish a reasonable suspicion, this Court now turns to other relevant factors to see whether they may corroborate the tip to reach the level of reasonable suspicion.

The Third Circuit has held that "where there is no basis for determining the reliability of a tip from the informant, the information contained in the tip cannot by itself be sufficient to provide . . . reasonable suspicion to justify a *Terry* stop. Instead, police must investigate further to provide independent corroboration of the tip. Such independent corroboration is measured by both the quantity and quality of the totality of circumstances."[43] Hence, the imprecise description must be considered alongside "any other relevant factors which tend to more narrowly define the universe of potential suspects and thereby constrain police discretion."[44] The Third Circuit has outlined several factors that, if observed by the police, can serve to corroborate a tip:

(1) The reputation of the area in which the stop occurred for criminal activity;

(2) A suspect's presence on a street at a late hour;

---

[42]  See, e.g., United States v. Brown, 448 F.3d 239, 247-48 (3d Cir. 2006) (stating that police broadcast identifying the "suspects as African-American males between 15 and 20 years of wearing dark, hooded sweatshirts and running south on 22nd Street, where one male was 5'8" and the other was 6'2" paints too broad a brush to satisfy the reasonable suspicion standard); United States v. Bouie, No. 01-507, 2002 WL 467314, at *5 (E.D. Pa. Mar. 26, 2002) (noting that a tip describing a "heavyset black male and a tall, thin black male in a blue car and a gray car with tinted windows" was insufficient in detail for purposes of reasonable suspicion).

[43]  Nelson, 284 F.3d at 479-80.

[44]  Goodrich, 450 F.3d at 561.

(3) A suspect's "nervous, evasive behavior," or flight from police;

(4) A suspect behaves in a way that conforms to police officers' specialized knowledge of criminal activity;

(5) the geographic and temporal proximity of the stop to the scene of the alleged crime; and

(6) the number of persons in the area.[45]

"Not every factor is necessary for reasonable suspicion . . . [and] there are no magic combinations that guarantee reasonable suspicion in every case."[46]  The Court must examine the "whole picture" rather than finely parse out the factors on which reasonable suspicion may depend.[47]

This Court discusses the above factors *seriatim*:


**(1)      reputation of the area as mid-level of crime**

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[48]  However, the Supreme Court has noted "the fact that the stop occurred in a 'high crime area' [is]

---

[45]  See Brown, 448 F.3d at 251; Goodrich, 450 F.3d at 561; see also United States v. Carstarphen, 298 F. App'x. 151, 156 (3d Cir. 2008).

[46]  Carstarphen, 298 F. App'x. at 156; accord Nelson, 284 F.3d at 478 ("The Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors . . .").

[47]  Bouie, 2002 WL 467314 at *5 (internal citations and quotations omitted).

[48]  Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (citations omitted).

among the relevant contextual considerations in the analysis."[49]  Here, Officer Lewis has testified that this specific area has a reputation for a mid-level amount of crime.

**(2)      time of day**

The investigatory stop occurred at or between approximately 3:54 a.m. and 4:15 a.m. This early hour supports an inference of criminal activity, "especially when considered alongside the area's reputation for criminal activity."[50]  Therefore, this case does not involve an "otherwise tranquil neighborhood during the daylight hours based only on a general description,"[51] but rather is based on knowledge of the make and color of a vehicle, driving in an area with a reputation for mid-level crime, at an hour where any other traffic was minimal.

**(3)      "nervous, evasive behavior" or flight from police**[52]

According to the testimony of Officers Lewis and Binns, their marked police vehicle was traveling behind the silver Cadillac on Glenwood Avenue soon after the radio call.  At a certain point and without any provocation by the officers, the driver of the Cadillac pulled over to the right side of the road and stopped in front of a closed, gated automobile lot.  Officer Lewis

---

[49]   Id. (Citations omitted).

[50]   Goodrich, 450 F.3d at 561 (citations omitted).

[51]   Id. (citations omitted).

[52]   The Court agrees that there is no evidence of flight from the police officers.  Also, Defendant's potential "nervous" behavior of looking down, with his hands down, making sudden movements is not considered relevant to our analysis because that behavior occurred after the investigatory stop.

believed this to be an avoidance tactic. Objectively, and in consideration of the totality of circumstances, this act could potentially be interpreted as nervous and evasive behavior, whereby the driver of the Cadillac pulled over to evade the marked police vehicle.

**(4)     police officers' specialized knowledge of criminal activity**

Driving along on Glenwood Avenue in a silver Cadillac Escalade/SUV at 4:00 a.m., and subsequently pulling over to the right side of the road, is a legal activity, but when considered in the totality of circumstances, it may amount to reasonable suspicion.[53]  Hence, this manuever, while "perhaps perfectly legal if considered in the abstract, must be considered from the proper vantage."[54]  Based on his previous experiences, Officer Lewis believed that the silver Cadillac may have pulled over as an avoidance tactic.

**(5)     geographic and temporal proximity of the stop to the scene of the alleged crime**

The anonymous complainant in this case reported that there was a robbery in progress and a person with a gun at the location of 300 West Glenwood Avenue.  Officers Lewis and Binns responded quickly—within one minute—and observed a silver Cadillac in the immediate vicinity of the reported criminal activity.  Hence, the vehicle matching the flash description was found

---

[53]   See, e.g., United States v. Nelson, 284 F.3d 472, 480 (3d Cir. 2002) (internal quotations and citations omitted).

[54]   Goodrich, 552 F.3d at 564; see also Johnson v. Campbell, 332 F.3d 199, 207 (3d Cir. 2003) ("[T]he Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief that a crime was about to be committed.").

near in time and place to the reported robbery.

**(6)    number of persons in the area**

Sergeant Morace and Officers Lewis and Binns have testified that there was virtually no pedestrian or motor vehicle traffic in the area of the alleged crime during the relevant early morning hours. For instance, Sergeant Morace saw only one other vehicle while at the scene conducting the stop and subsequent investigation, and he saw one pedestrian upon the completion of the investigation. The police officers did not observe any other silver Cadillacs or SUVs in the area.

**CONCLUSIONS OF LAW**

1.    Based on the totality of circumstances, the law enforcement officers' stop of the silver Cadillac and its occupants was based on reasonable suspicion: the information about the vehicle provided by the radio calls; the reputation of the geographic area for mid-level crime; the early morning hour; the suspicious conduct of the Cadillac parking in front of a closed business; the extremely close proximity of the vehicle to the alleged location of the crime; the short time period between dispatch and the sighting of the vehicle; and the empty streets during the relevant morning hours provide enough objective facts to warrant an investigatory stop.

2.    Relying on the information provided, Officers Lewis and Binns's decision to stop the silver Cadillac for investigatory purposes was supported by reasonable suspicion and did not violate the Fourth Amendment.

3.    Because the initial stop of the vehicle was legal, the fruit of the poisonous tree doctrine does not apply—the firearms, cash and subsequent incriminating statement are all properly admitted.

4.    Furthermore, the scope of the investigatory stop, including the removal, pat-down, and detention of all the occupants of the vehicle, as well as the limited search of the vehicle, was reasonable and justifiable due to the dangerous nature of the alleged crime, the need to ensure the personal safety of the officers, and the

maintenance of the status quo during the course of the stop.

5.      In addition, Defendant voluntarily provided his incriminating oral statement. Defendant was informed of his *Miranda* rights both orally and in writing. Defendant then waived his *Miranda* rights and made an incriminating statement.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion to Suppress Physical Evidence and

Statements is DENIED.  An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL ACTION** |
| | ) | **NO. 09-806** |
| | ) | |
| **DWAYNE PARKER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

**AND NOW**, this 5th day of November 2010, upon consideration of Defendant's Motion to Suppress Physical Evidence and Statements [Doc. No. 18] seeking the suppression of physical evidence obtained on October 22, 2009 in connection with an investigatory stop of a silver Cadillac Escalade, as well as a subsequent incriminating statement elicited from Defendant on January 11, 2010, the Government's Response to Defendant's Motion to Suppress Physical Evidence and Statements [Doc. No. 25], after evidentiary hearing and oral argument thereon, and in accordance with the Court's decision entered September 9, 2010 [Doc. No. 32], it is hereby

**ORDERED** that Defendant's Motion to Suppress Physical Evidence and Statements [Doc. No. 18] is **DENIED**.

It is so **ORDERED**.

**BY THE COURT:**

*/s/ Cynthia M. Rufe*

_____

**CYNTHIA M. RUFE, J.**